1  Thomas W. Davis, II
   HOWARD & HOWARD
2  Wells Fargo Tower, Suite 1000
   3800 Howard Hughes Parkway
3  Las Vegas, NV  89169-5980
   Telephone:   (702) 257-1483
4  Facsimile:   (702) 567-1568
   Email:        tdavis@howardandhoward.com
5
   Lewis K. Loss
6  Matthew J. Dendinger
   Richard W. Boone Jr.
7  LOSS, JUDGE & WARD, LLP
   Two Lafayette Centre
8  1133 21st Street, NW, Suite 450
   Washington, DC 20036
9  Telephone:   (202) 778-4060
   Facsimile:   (202) 778-4099
10 Email:   lloss@ljwllp.com
            mdendinger@ljwllp.com
11          rboone@ljwllp.com

12 Attorneys for Progressive Casualty Insurance Company

13          UNITED STATES DISTRICT COURT
               DISTRICT OF NEVADA
14

15 PROGRESSIVE CASUALTY                    Case No. 2:11-CV-00678-LRH-PAL
   INSURANCE COMPANY,

16          Plaintiff,

17 v.                                      **PLAINTIFF PROGRESSIVE
                                           CASUALTY INSURANCE
18 JACKIE K. DELANEY; LARRY E.             COMPANY'S OPPOSITION TO
   CARTER; MARK A. STOUT; KENNETH          FEDERAL DEPOSIT INSURANCE
19 TEMPLETON; JOHN SHIVELY;                CORPORATION, AS RECEIVER FOR
   STEVEN C. KALB; JEROME F.               SUN WEST BANK'S, MOTION TO
20 SNYDER; HUGH TEMPLETON; RICK            COMPEL PROGRESSIVE
   DRESCHLER; and the FEDERAL              CASUALTY INSURANCE
21 DEPOSIT INSURANCE CORPORATION           COMPANY'S TIMELY PRODUCTION
   as receiver for SUN WEST BANK,          OF DOCUMENTS**

22
            Defendants.
23

24         Now comes Plaintiff Progressive Casualty Insurance Company ("Progressive"), by

25 and through its undersigned counsel, and respectfully submits this opposition to the Federal

26 Deposit Insurance Corporation, as Receiver for Sun West Bank's, Motion to Compel

27 [DE 89].

# I.

## __INTRODUCTION__

This action is one of eight similar declaratory judgment actions in which Progressive and the FDIC are involved. As the Court is well aware at this point, the discovery the FDIC seeks from Progressive in this matter is part of a much larger, and ever-expanding, universe of discovery the FDIC is seeking as part of a scorched-earth effort to make it as painful as possible for Progressive to obtain a declaration of its rights under the insurance policy at issue. (Ex. A, Declaration of Matthew J. Dendinger ("Dendinger Decl."), ¶¶ 6–9).

By way of example, to date, the FDIC has served Progressive with eight requests for production setting forth 386 categories of documents to be produced. (*Id.*, ¶ 7). The FDIC also has issued more than thirty third-party subpoenas, including five subpoenas to Progressive's managing general agent, ABA Insurance Services Inc. ("ABAIS"), setting forth 155 categories of documents to be produced.[1] (*Id.*, ¶ 9). And with respect to ESI, the FDIC has served Progressive with five separate sets of proposed ESI search terms in five different matters, including this one. (*Id.*, ¶ 18). The majority of the FDIC's proposed search terms, though slightly different, are designed to identify the same universe of documents. (*Id.*). Much of the information the FDIC seeks is discovery about discovery. Most recently in this regard, on January 10, 2014, the FDIC served Progressive in this matter an additional twenty-two requests for the production of documents, eighteen of which are about discovery. (*Id.*, ¶ 8, Ex. 2).

Progressive is pursuing an approach to the review and production of ESI that will allow it to complete that process in as quick, efficient, and effective a manner as possible. Therefore, Progressive respectfully requests that the Court refrain from imposing on Progressive the arbitrary, January 24 deadline the FDIC requests, which may prove impossible to meet for reasons that are beyond Progressive's control. As discussed further

---

[1] Although the FDIC's requests are overlapping in significant requests, they are just different enough to be both duplicative and massively burdensome.

below, the time Progressive will ultimately require to complete its review and production of ESI will be directly affected by the level of cooperation it receives from the FDIC. And thus far, the FDIC has come up short.

## II.

## BACKGROUND

Because the FDIC's motion focuses primarily on Progressive's production of ESI, that will be the focus of this brief as well. It bears noting, though, that Progressive has produced a significant number of documents to the FDIC:

First, on August 13, 2010, in response to a June 18, 2010 pre-litigation request for documents from the FDIC, Progressive produced approximately 1,000 pages of documents. (Ex. A, Dendinger Decl., ¶ 10). This production included: (1) D&O insurance policies issued by Progressive to Sun West over the prior five years; (2) insurance proposals submitted by Progressive; (3) insurance applications submitted to Progressive; (4) renewal requests; and (5) correspondence between Progressive and Sun West related to the preceding categories of documents. (*Id.*).

Second, Progressive has produced to the FDIC in five of the pending declaratory judgment actions approximately 5,000 pages of hard-copy documents requested by the FDIC that are common to all of the pending actions, including: (1) marketing materials; (2) underwriting guidelines; and (3) policy drafting history and related documents. (*Id.*, ¶ 11). Although Progressive has not re-Bates labeled these documents and produced them specifically in this matter, counsel for the FDIC in this action also is counsel of record for the FDIC in four of the five actions in which Progressive has produced these documents. And, at the FDIC's request, Progressive agreed that documents produced in one action could be used in all of the pending actions.[2] (*Id.*, ¶ 12).

---

[2] Progressive did so to minimize the need for the parties to engage in duplicative discovery across actions. The FDIC is doing so nonetheless.

Third, on December 16, 2013, Progressive produced an additional approximately 14,000 pages of documents to the FDIC pursuant to the Court's December 10, 2013 minute order [DE 83], along with a privilege log identifying documents withheld from that production or redacted as privileged and/or work product. (*Id.*, ¶ 13).

Fourth, on January 8, 2014, Progressive produced approximately 1,000 additional pages of documents to the FDIC pursuant to the Court's December 10 order. (*Id.*, ¶ 14). Progressive provided a privilege log identifying documents withheld from that production or redacted as privileged and/or work product on January 13, 2014. (*Id.*). Thus, to date, Progressive has produced to the FDIC a total of approximately 21,000 pages of documents.

A.    **ESI Discovery to Date**

With respect to ESI, because of the ever-increasing volume of documents retrieved by the FDIC's search terms—now at 565,487 documents, not pages, based on the five separate sets of proposed search terms provided by the FDIC—ESI presents the single greatest challenge with respect to discovery in the pending DJ actions. (*Id.*, ¶ 21). As discussed in greater detail in Mr. Dendinger's declaration, the enormity of the ESI task has led Progressive and its counsel to examine and re-examine on multiple occasions how best to process the mountain of material sought by the FDIC. (*Id.*, ¶¶ 15–48).

Before learning the total number of ESI documents it would be necessary to review, it had been Progressive's and its counsel's intention to host the documents in-house and review them using the Summation software program. (*Id.*, ¶ 22). The massive number of documents retrieved by the FDIC's first two sets of search terms, approximately 480,000, rendered this infeasible from a technical perspective. (*Id.*, ¶ 23). Progressive and its counsel therefore switched to an online review platform, Relativity, and employed contract attorney reviewers to conduct an initial manual review of the ESI documents for relevance. (*Id.*, ¶ 24–27). After approximately a month, though, it became apparent based on the pace of the review that it would require an unacceptably long period of time to complete—approximately

six to eight months—at an unacceptably high cost to Progressive.  (*Id.*, ¶ 28).  Therefore, Progressive and its counsel began exploring alternative approaches.  (*Id.*, ¶ 29).

Progressive retained as a consulting expert a nationally recognized authority in the field of e-discovery, Conor Crowley, and, based on Mr. Crowley's recommendation, determined to use predictive coding technology to speed the review and production of ESI.[3] (*Id.*, ¶¶ 30–31).  Specifically, Progressive has selected Equivio, a company recommended by Mr. Crowley, to implement a predictive coding-based review of Progressive's ESI.  (*Id.*, ¶ 32).  A summary of this review process are set forth in Section II.B. below.

On or about December 20, 2013, Progressive's counsel requested a meeting with representatives of the FDIC, which Mr. Crowley planned to attend, to discuss Progressive's plan to utilize predictive coding technology to expedite in a proper manner the completion of its review and production of ESI.  (*Id.*, ¶ 49).  As Progressive's counsel explained to the FDIC's counsel, this proposed meeting was to be informational in nature.  (*Id.*, ¶ 50).  On January 7, 2014, the FDIC's counsel advised Progressive's counsel that, as an absolute pre-condition to the FDIC's participation in any such informational meeting, the FDIC demanded a formal, written summary of Progressive's plan.  (*Id.*, ¶ 51).  The FDIC's counsel advised that the FDIC refused to attend any meeting regarding ESI unless Progressive acceded to this demand.  (*Id.*).  Later on January 7, the FDIC's counsel sent a letter memorializing the FDIC's position and requesting some twenty-nine categories of information.  (*Id.*, ¶ 52).

The FDIC's response further reveals the FDIC's intent to manufacture as many disputes about discovery as it possibly can, thereby imposing maximum burden on Progressive and this Court.  When advised that a manual review of the 565,000+ documents retrieved by the FDIC's search terms would take months to complete, the FDIC complained vociferously.  When advised that Progressive is moving to an approach that will dramatically shorten the timeframe for its production of ESI, and that is more accurate and reliable than a

---

[3] Mr. Crowley's CV is attached as Exhibit 1 to Mr. Dendinger's declaration.

manual review, the FDIC responds with, effectively, dozens of written interrogatories about the new approach rather than simply sitting down to discuss the approach in a collaborative fashion.  It has become increasingly clear that, short of throwing open its doors to the FDIC, both physical and electronic, and allowing the FDIC and its counsel to rummage through its files at will, there is nothing Progressive can do with respect to discovery that will not lead to still more complaints from the FDIC, still more demands for additional documents and information, and still more motion practice.

**B.     Progressive's Planned Approach to ESI[4]**

Although Progressive had hoped to be able to discuss its planned approach to ESI with the FDIC and its counsel prior to responding to the FDIC's motion to compel, in light of the FDIC's refusal to meet with Progressive's counsel and ESI consultant, Progressive takes this opportunity to advise the FDIC and the Court of its plan.

As noted above, Progressive has retained Equivio to implement a predictive coding-based review of the 565,000+ documents retrieved by the FDIC's proposed ESI search terms. (*Id.*, ¶ 32).  Briefly summarized, this involves a "subject matter expert"—i.e., someone who is very familiar with the issues in the litigation, the universe of documents requested, etc.— reviewing a statistically significant sampling of the 565,000+ documents and determining, with respect to each document, whether it is relevant or not relevant.  (*Id.*, ¶ 33).  There is no one more knowledgeable about these issues than Mr. Dendinger, and he is the subject matter expert who is performing this review.   (*Id.*,  ¶ 34).   Mr. Dendinger's determinations concerning relevance are used to teach Equivio's predictive coding software which of the 565,000+ documents are relevant and which documents are not relevant.  (*Id.*, ¶ 35).  Once trained, the system then uses the knowledge Mr. Dendinger has imparted to sort the 565,000+ documents into two groups, relevant documents and non-relevant documents.  (*Id.*, ¶ 36).  At

---

[4] Progressive's counsel has discussed this planned approach with Mr. Crowley, and he is in agreement with it.  (*Id.*, ¶ 45).

this point, Progressive's counsel will review a sampling of documents from both groups in order to confirm that the software has done a satisfactory job. (*Id.*, ¶ 37).

The documents determined to be relevant will include some documents that are protected from disclosure by the attorney-client privilege and/or the work-product doctrine. (*Id.*, ¶ 38). Progressive intends to search these documents using attorney names and law firm domains—i.e., ljwllp.com—that it has reason to believe may be reflected in the documents, along with a list of additional law firm domains,[5] in order to further divide the relevant documents into two subgroups: (1) documents that are more likely to be privileged because they contain an attorney name or law firm domain; and (2) documents that are less likely to be privileged because they do not contain such a name or domain. (*Id.*, ¶ 39). Progressive's counsel intends to review each of the documents in the first group to determine whether each document is, in fact, privileged or work product. (*Id.*, ¶ 40). Progressive will produce any such documents or portions of documents that it determines are not privileged, along with a log reflecting the documents or portions thereof Progressive has withheld or redacted. (*Id.*, ¶ 41). The length of time this review and production reasonably will take will depend on the number of documents that ultimately are assigned to this first group. (*Id.*, ¶ 42).

With respect to the documents in the second group, Progressive's preferred approach is promptly to produce these documents without reviewing each individual document prior to production. (*Id.*, ¶ 43). In order to do so, though, Progressive has identified two points on which it will need the FDIC's cooperation and agreement.[6] First, the FDIC would need to agree that all documents produced in this group would be deemed confidential pursuant to

---

[5] As an insurance company, Progressive regularly receives communications from counsel for its insureds that may be privileged and/or work product, as does ABAIS, its managing general agent. The purpose of using a general list of law firm domains is to attempt to identify documents reflecting such communications.

[6] The individual defendants also would need to agree, though Progressive does not have reason to expect any issues in this regard. Absent agreement by the FDIC and/or the individual defendants, an alternative would be for the Court to enter an order to this effect.

1    the protective order in this action, subject to the parties meeting and conferring concerning

2    the confidential nature of any particular documents as the need arises—e.g., if the FDIC

3    wants to file such a document with the Court.  (*Id.*, ¶ 44).  Second, the FDIC would need to

4    agree that Progressive would be permitted to "claw back" any documents in this second

5    group that it subsequently determines are, in fact, privileged or work product.[7]  (*Id.*).

6    **C.**     **Predictive Coding Status**

7          Progressive's predictive coding discovery plan is well underway.  (*Id.*, ¶ 46).  In

8    addition to retaining Mr. Crowley and selecting a predictive coding vendor to facilitate the

9    process, Equivio, Mr. Dendinger has made significant headway in training the Equivio

10    software through the review of sample document sets.[8]  (*Id.*, ¶ 47).  At present, it is estimated

11    that the training process will be completed within the next week and that shortly thereafter

12    the resulting documents will be able to be segregated into the privilege groups discussed

13    above, more likely privileged and less likely privileged.  At that point, assuming Progressive

14    receives the necessary cooperation from the FDIC and the Ds & Os, Progressive will be able

15    to produce the documents in the latter group.

16                                 **III.**

17                            **ARGUMENT**

18          Contrary to the FDIC's assertion, Progressive has not "ignored" its discovery

19    obligations, including those pertaining to ESI.  In fact, Progressive and its counsel have

20    devoted, and continue to devote, enormous time and resources to the FDIC's voluminous

21    discovery requests and, specifically, to the review and production of the 565,000+ ESI

22    documents retrieved by the FDIC's search terms.  Due to this vast number of documents,

23    though, this has been a challenging process.  However, Progressive is confident that, with the

24

25

26

27

---

[7] It is possible that Progressive, its counsel, and/or Mr. Crowley, may identify additional understandings or agreements necessary to facilitate Progressive's review and production of ESI in the manner described above.  Progressive therefore reserves its rights in this regard.

[8] Ironically, Mr. Dendinger was required to take time away from this review in order to draft this response to the FDIC's motion to compel production of ESI.  (*Id.*, ¶ 48).

assistance of its e-discovery expert, Mr. Crowley, it has identified a plan that will allow it to complete the review and production of ESI in the quickest, most efficient, and most effective manner possible.  Therefore, Progressive respectfully submits that the Court should refrain from imposing the artificial, January 24 deadline the FDIC requests.

Further, if the Court is inclined to set a specific deadline for Progressive's production of ESI, Progressive requests that the Court refrain from doing so at least until the following has occurred: (1) Mr. Dendinger has completed the training of the Equivio predictive coding software; (2) the software has determined which of the 565,000+ ESI documents are relevant; (3) those documents have been divided into groups of those documents that are more likely to be privileged and those that are less likely to be privileged; and (4) the FDIC and individual defendants have agreed to Progressive's approach to the production of the documents in the second group, or the Court has entered an order approving that approach. As noted above, Progressive expects items one through three will be completed soon.  As for item four, the date by when it can be completed depends entirely on the FDIC's willingness to cooperate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IV.

## CONCLUSION

For all of the foregoing reasons, Progressive respectfully requests that the Court enter an order denying the FDIC's Motion to Compel and granting such other and further relief as it deems just and proper.

Respectfully submitted this 13th day of January, 2014.

HOWARD & HOWARD ATTORNEYS

By /s/ Thomas W. Davis, II
    Thomas W. Davis, II
    Wells Fargo Tower, Suite 1000
    3800 Howard Hughes Parkway
    Las Vegas, NV 89169

LOSS, JUDGE & WARD, LLP
    Lewis K. Loss (*pro hac vice*)
    Matthew J. Dendinger (*pro hac vice*)
    Richard W. Boone, Jr. (*pro hac vice*)
    Two Lafayette Centre
    1133 21st St., NW, Suite 450
    Washington, DC 20036

    *Attorneys for Progressive Casualty Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of January, 2014, I caused a copy of the foregoing **Plaintiff Progressive Casualty Insurance Company's Opposition to Federal Deposit Insurance Corporation, as Receiver for Sun West Bank's, Motion to Compel Progressive Casualty Insurance Company's Timely Production of Documents** to be electronically served upon all attorneys of record in this action.

    Barbara J. Dunn
    An Employee of Howard & Howard